Your argument is 18-1945, Defense v. Northrop Grumman. Well, sorry to keep you all waiting. Hopefully it was worth the wait. I think we're all ready. Please proceed. May it please the Court. Everyone agrees that unallowable costs cannot be passed on to the government, but that's exactly what the Board's quantum ruling does. Northrop says that the unallowable costs were eliminated by savings from an amendment to its plan that would reduce the benefits paid to retirees and therefore reduce future expenses. But those savings are supposed to flow to the government. Can I ask you a question about that? And I don't have it right in front of me, but on the quantum decision, it seems to me the Board maybe was making a distinction between when they reduced the benefits for the plan. They talked about it was done before the transition versus after. Is that ringing any bells to you? Is it your reading of the Board that somehow it mattered to them when the change was made to the benefit plan? My recollection, Your Honor, is that the Board latched onto the idea that the negative, the savings, was subtracted before the transition obligation was calculated to the point that it was going to the government. But the argument does not make sense. The unfunded cost, that 253, that does not disappear. It does not come out of the books. Well, it does disappear because it came about by readjusting the PRB, correct? I mean, now as a result of what Northrop did, the workers are going to receive less benefits. On the 307, so the 253 is the unfunded, disputed cost here. The 307 million is the savings. The workers will receive less benefits under the plan, and that will generate savings. But the 253 million- The less benefits that they get, that's what comes out to 250 million. No, the 253 million. It's calculated in a DCA audit, so on Appendix 168, you've got the calculation of that 253 million. That 253 million is the difference for certain years and contracts, the relevant ones here, that's the difference between the amounts that were recognized in Northrop's financial reporting under the GAAP rule, that FAS 106 rule, and the amounts that were not measured or funded, and that's the key, funded, in his government contracts accounting because it was using the lesser DEFRA amounts. So that 253 million has nothing to do with the benefits that the employees will ultimately get. And this is critical to remember. We're talking about accrual accounting, not cash basis accounting. So your theory is that it's separate and distinct. So they had to come up with the 253 million to correspond to what went down before 2006 because there was a disparity between FAS and DEFRA, and that's done. So then your view is what, that when they made the negative plan amendment, any savings that inure are separate and distinct to which the government is entitled? I'm just trying to understand what you're saying. That's right, Your Honor. There's no basis to link these two things up. You can't just grab some negative in the books and use it to offset a positive. They're both still there. Have they transferred the 250 million? I know it's the government, and it's hard to talk about real money here, but what happened? Because of DCMA's disallowance, because DCMA said, you have to remove that from your statements to us. The government has not paid, is not paying right now, that amortized over 20 years 253 million. The board's quantum ruling overturns that disallowance. So now they don't have to remove those costs from their statements. Our position is those costs are in the calculation that they started presenting post-accounting transition under FAS 106 because there's no way to avoid it. When you transition, when you say, I'm now going to calculate my accumulated obligation under FAS 106, you can't leave out a component that FAS 106 requires, this escalation. That's the unfunded amount. That's the disputed cost. That's what wasn't included in the lesser-defer amounts. When you transition and say to the government, now all of a sudden I'm going to present my costs to you and I'm going to fund my plan based on FAS 106, you are unavoidably necessarily including that amount. Northrop's position, the crux of this case is, we negated that through this plan amendment, but you can't link the plan amendment. And the easiest place to see this is Northrop's old letters. They negated what? When you say they negated that, what is that? The $253 million in unallowable costs. Northrop says that the savings from reducing benefits, from amending the plan, that that eliminated, erased this unallowable transition obligation. And the government, just taking that at face value, yeah, the government is only, when they have a negative plan, the government doesn't have to pay for this number up here, it pays for this number down here. So the government is saving that money, right? But that's what's at issue in the case. If the board's quantum ruling stands, the government is being deprived of most of those savings because they're going to offset costs that the government is not supposed to pay. But they're not going to offset the $253 million. They absolutely are, because both are in the numbers. Let me see if I understand this whole transaction. Well, why don't you finish your answer, and then I'll get to my question. I wanted to point the Court to page 6 of our reply brief where we put in, we show a part of the financial reporting, a statement. I think it'll provide some tangible numbers to this. If you look at the excerpt, which comes out of... I'm confused that you're in yellow page 6. Yes, in yellow page 6 at the top, you'll see an excerpt of Northrop's financial reporting. And so the plan amendment is its own line, and that $464 million included within that is the savings, the $307 million that's applicable here. That's a separate line item. And Northrop's position is that that eliminates prior service costs. Service costs are shown on a separate line. These are separate items. The service cost is never going to come out. The service cost is never going to change. The prior service cost is in the books. It's historical. It can't change. In this, these financial reporting numbers, FAST-106, the GAAP rule, there was no transition relevant here. FAST-106, the GAAP accounting, was used all along.  But then when you look at the other set of books, now you look at this other – the same employees are doing the same work on the same contracts. Well, you've got this separate government contracts book, and you look in those separate books, and you're still going to have the same amount of savings. But now all of a sudden, instead of having recognized prior service costs to this extent over those previous years, you've recognized much less. That's shown on page 13 of our opening brief, the blue brief. We have a graph that shows two sets of bars. And so you're missing $253 million that had been reported all along in the GAAP books for financial reporting, but not in the government contracts books. When you make that transition, and now you're under GAAP for both, that $253 does not disappear, and it's not supposed to be paid under the rules that all contractors agree to as a basic part of the bargain. So are you done with your answer to Judge Rand? I believe so, Your Honor. Okay. So I take it, simplifying as best I can this transaction, your position is that up until 2006, because of the difference between the DEFRA line and the FAST-106 line, there was an underclaiming of $253 million, which, because it was underclaimed, was unallowable because it was never claimed. Okay. And that, therefore, you're $253 million ahead, the government. Right? At that point. Not exactly, Your Honor. It's close. But we wouldn't agree that there was any underclaiming because the only amounts are entitled to recover. You are not claiming as much as you could have claimed, as they could have claimed. All right. That's what I meant by underclaiming. Okay. And then, starting in 2006, after the plan amendment, suddenly $307 million comes out of the employee benefits package. Right? It doesn't need to go to the trustee. Well, I understand, but whether it's going to the employees or it's in the transition obligation or it's in the benefit plan, it's coming out. It's a reduction in the total cost of the benefit package of $307 million. Right? That's right. Go ahead. Except it doesn't come out of anywhere. It just doesn't need to be contributed. I understand. But it's less than otherwise would have been paid had they stayed at the FAS 106 line. Yes. Yes. Yeah. Okay. Now, your position, as I understand it, is that although there's a dispute about whether this was raised before the board or whether you argued it there or argued it here, which is in a footnote back and forth, you look quizzical. You understand that at page 43 of the red brief, there's a point that the government has forfeited this argument. And you have a footnote in which you respond, oh, no, we didn't. We made this argument before the board. Except we understand the argument they're saying we forfeited is one we're not arguing. And I have an issue with that because it seems to me that the issue they say you're forfeiting was exactly the argument you're making earlier in your blue brief. But let's pass that for a minute because I do want to question you about that. But getting back to the numbers, number one, you say we get to keep the $253 million because that's unallowable then, now, and forever. And you also say, if I understand your position correctly, that you get either all of or the bulk of the reduction in the expense that comes with the plan amendment because it's a reimbursement contract and the government gets the benefit of any reduction in the cost. Right? When your Honor says that we get to keep the $253, what it means is that they can't present a charge. You say they cannot do any, by offset or any other method, they can't recover the $253 that they could have had. That's what I mean by keep. That's correct. Okay. So you're $253 ahead at that point. Then the $307, as I understand it, you're saying we were entitled to share in that, presumably to get all of it. Right? And we don't agree that we're ahead $253. We don't think in these terms. I know you don't think in these terms, but I do. Because the net result, it seems to me, is that you're going to come out $560 million ahead of where you would have been if they had been at the FAS 106 line all along. Isn't that true? No, Your Honor. Okay. Why is that not true? If they had been at the FAS 106 line all along... They would have claimed the extra $253 at the beginning. They would have gotten it. Right. And they wouldn't have changed their plan. They wouldn't have had the plan amended if they had stayed at FAS 106. And so you wouldn't have gotten the $307. I'm sorry. That's the part that I don't agree. We wouldn't get the $307. We only don't get the $307 if they don't amend the plan. I said that. I said they're not amending the plan. Under FAS 106 all the way along. Okay. Are you with me? The only thing I want to make sure we're on the same page on is we don't agree that there's a connection between the change in the benefits. I know. I know. Stay with me here. You have to stop because it's disrupting the flow and it's informative, so you have to hold your comments until later. Okay. Well, all right. So I don't see why it's not the case that you are asking to be $560 million better off than you would have been if they had been at the FAS 106 line all along. Is that not true? It is not true. Okay. Why? If they were at the FAS 106 line all along and they had funded and claimed and we paid out the $253, we would have paid $253 million more. That's true. Right. The part that I am not connecting with you, Your Honor, is on the 307. Okay. So at the point we get to 2006, if they had been at the FAS line, you would be, at that point, you would be $253 million worse off than you claim that you're entitled to be on the fax as they are in this case. All right. And then if they reduced, at that point, if they adopted a plan amendment and reduced their payments by $307 million, you would say you get the benefit of that $307 million reduction as well. So you get to save an additional $307 million, right? We definitely save the money if they save the money. That's just how it works with us reimbursing contracts. But you're a total of $560 million better off, right? I don't think we see it that way, Your Honor. And I think part of the major disconnect here is that this isn't just a question of what's most fair, what's the best rule. Did DCMA apply the rule to Northrop's decisions correctly? Northrop takes the view, well, we're not double recovering. We're not getting anything that we're not spending. But that's not the question. These cost allowability rules apply to all the contractors. Everybody's got to follow the same rules. Northrop's arguments are not grounded in the text of the regulation, the rule that is there. If you read the FAS 106 rule, it couldn't be clearer, this idea, that the costs arise as the obligation arise as the employees work. That's totally contrary to the board's conclusion that the costs were never incurred. It's just wrong to say that they were never incurred. The term incurred, you equate, I think, with the term accrued. That's right, except for when the term is used to say what the contractor did. But yes, the costs are accruing. They are being incurred, whether or not they're written down in this separate government contracts book. I mean, we know they're there because we see them in the financial reporting books. And where do you find that, at least in this context, the term incurred is being used to mean the same thing as accrued? I mean, there's no doubt that the costs are accruing in the pre-2006 period. But I don't see quite where they're being incurred. Because if incurred is used as it's usually used, in my experience at least, that would be what they're actually having to pay out. And they're paying out at the DEFRA line, not at the FAS 106 line. That's the part that's incorrect, Your Honor. That's a cash basis approach, not an accrual approach. So if you read just the second paragraph of the accrual gap rule, FAS 106, it's in Appendix E at FAS 106-2. The employer's obligation for that compensation is incurred. Where is this that you're reading? I'm on Appendix E of the blue brief. I'm at FAS 106-2. And I'm in the second paragraph in the last sentence. And so that last sentence of the second paragraph in Appendix E... Employer's obligation for that compensation is incurred as employees render the services necessary to earn their post-retirement benefits. That word incurred is... Obligation is incurred, right? Right. It's just throughout the rule at page 35, paragraph 146. The employer's obligation for that compensation is incurred when the services exchanged for that benefit are rendered not when an employee terminates or when a retiree receives the benefits. Under the cash basis accounting, the costs don't hit the books until the benefits are paid. But under accrual accounting, when the benefits get paid, what happens later does not matter. What matters for your accruals in your accounting books, which aren't going to change based on later events, is what employee-employer exchange you have as those contracts are being performed, as the employees are earning these benefits. The best place to look and see that they're separate events is in Northrop's own letters. When they tell us they're making the change, they don't try to link them together. They say, Government, we've changed the plan amendment. You're going to realize about $15 million in savings per year. That's on Appendix 125, those calculations. In that letter at Appendix 124, they make clear, this has nothing to do with the accounting. They're not linking them together there. There's no question that if only the amendment was made and no change in accounting, the government would have saved $307 million. If only the change in accounting, but no change in the benefits to the employees, the government would not pay under the rules that everybody's got to follow. The only question for the court is, what's the correct interpretation of the rule? The government would have saved, or not paid, the $253 million because it was unallowed at that point. Linking these together is incorrect. Can you, before you sit down, I think Judge Bryson had referenced the waiver kind of issue that came up in the debate over the briefs, that you were going to differentiate between what argument you didn't make and how that's different. You know what I'm talking about? I do, Your Honor. I just have to find it again. I believe the reference was to... Well, here are the references. I can give them to you. The red brief at page 42 and 43 characterizes an argument that you're now making that according to the red brief you didn't make to the board, which is that when North amended the plan to reduce its total PRB obligation by $307 million, the government was entitled to be paid the entirety of that cost reduction. And you respond at page 20 of the yellow brief by saying you... This is an argument we have never made. But when I turn to page 4, I think it is, of the government's brief, I find the...  When you talk about the government was kept from realizing its share of the PRB plan cost savings... Oh, I'm sorry, at the top of the page. When North elected to reduce the PRB plan benefits, the government was entitled to realize all $370 million in resulting cost savings. That's the argument that they say you didn't raise before the board. And you say we have never made that argument. Here's the difference, Your Honor. I understand what you're asking. That looks to me like it's almost exactly the same words that they characterized you as not having argued to the board. We're not arguing, and never have, that we are entitled to have them write us a check or take the money out, in some way give us the money back. The argument, I understand its nuance, but here's the difference. The money goes into this plan. It goes up, it goes down, money goes in. The only way in which we're entitled to receive a refund of what we've previously put in is if that money leaves the trustee and goes back to North. I'm not saying that. So the quibble here is over the word paid? Because Red has characterized this, the government appears to contend the government was entitled to be paid the entirety of the cost reduction. So when you say you've never made that argument, are you referring to the paid part of that? That's exactly right. We're not saying that we have to be paid any money. Did you make the argument to the board that you were entitled to the benefit of the $307 million? Absolutely. Because the citations that you, I've read all the citations that appear in footnote 6 of your yellow brief, and I didn't see any such argument made in any of those citations. So where did you make that argument? We certainly think we made the argument by saying that they're not connected. In other words, the savings, here's I think where it's getting confusing. Show me somewhere where you came as close as you think you needed to come to making that argument. I think the example in there about, and it's a bit of hyperbole, but the example about the credit card may be the closest one that I have. Where is that? I have to check here. It's in the 1500s of the appendix. Bear with me one moment. So on appendix 1549, Yeah. the example given is that there's a credit card bill. What document is this, by the way? This is in the appendix. This is your brief. This is a brief from below, yes. So the argument is, or the analogy is made that there won't be further costs incurred in the future. And so as a result, previous charges aren't there anymore. Not due. Don't need to be paid. And that's just not correct. Nothing disappears. Because you can't just grab some negative out of the books and say that the positive charge is gone. It's still there. They're both in the books. We can see that in the financial reporting for example. And so the point is, certainly savings means savings. No one's saying that that has to come back to the government. That's not the argument. The argument is that what's meant by the savings, and so this is explained, it's explained by Northrop's expert at, for example, 1419, how that was calculated. And did the government actually get the benefit of the $307 million reduction? We're only getting the benefit right now. Set aside the 253. Set aside the question of whether that's allowable. We're getting that benefit because of the disallowance. If not for the disallowance, we wouldn't get the benefit. So at the end of the day, you're saying that the... Well, go ahead. Yeah, I understand. Let's hear from the other side. Thank you. May it please the Court. This case may seem complicated, but one straightforward point resolves it. Northrop did not charge the government anything in excess of what Northrop was entitled to charge under FAST 106. It didn't charge the $253 million at issue before 2006. We agree about that. And it didn't charge the $253 million at issue in the transition obligation either. Now, my friends on the other side disagree with that, but that was the exact question put before the Board at the quantum hearing, and that was the exact issue adjudicated, whether the $253 million, that was the difference between the DEFRA and the FAST during the 1995-2006 period, was incorporated into the transition obligation or not. And what the Board found... Mr. Merrill, it seems to me that the current Board established that there was zero liability on behalf of... or zero damages. And the government seems to be arguing that under the applicable accounting procedures, we're owed $253 million. And so the question, the way I see it, is that who do we follow here? I mean, there was a regulation in place that required certain accounting procedures to take place, and under that, at 2006, then there was an amount of the $315 million that normally would have been paid. But because of Northrop's accounting transition, then that amount came to zero, and the quorum board says there's zero damages involved. Yet under the regulation, it does seem to me that Northrop was required to have been paying into the system we're expecting a debt of the $253 million that we're talking about. I understand Your Honor's point, and I think there's a way to clarify so that there's not any inconsistency between the two, and it's this, and I think this is a key point. There is a difference between saying a cost is unallowable and the disallowance of that cost. A cost may be unallowable, but it only becomes disallowed if the contractor actually puts it in its incurred cost submission and seeks to charge the government that amount. At that point, an unallowable cost can be disallowed. So even if the costs for the difference between DEFRA and FAST-106 from 1995 to 2006 was an unallowable cost, that doesn't prove the government's case. What the government has to show is that we included that in our incurred cost submission for the transition plan, and then they could disallow it. And that is exactly what the quantum board adjudicated. They didn't just adjudicate the question of whether there was damage or harm. What they found, and this you can see at pages 41 and 42 of the appendix, and if you bear with me while I quote it, the government has failed to sustain its burden of proving that any of the disallowed amount was or will be amortized as part of the transition obligation and claim during post-transition years. So never claimed. Unallowable? Maybe, maybe not. But never claimed, therefore no basis for disallowance. That was based on a factual finding, and you can see this at page 35 of the appendix. The board found that the same costs, and those are the board's words, the same costs that were eliminated by the plan amendment in 2006 were the costs that constituted the unfunded amount due to the use of DEFRA rather than FAST-106. And that was in turn based on expert testimony from our expert, Mr. McQuaid, and you can see that testimony at pages 821 to 830 of the appendix. His expert report in the key pages there, 1292 to 99 of the appendix, and the person who oversaw the calculation of the transition obligation, Ms. Ma, who the board at page 35 of the appendix said was highly credible, testified, and this is at pages 1023 and 1024 of the appendix, that we backed out that delta when we calculated the transition obligation. So in 2006, what was the transition obligation for the plan? So I think it would be helpful, too, if I could just kind of walk through how you calculate a transition obligation, because I think it will further clarify why the government's position is just wrong. The way this works, and this is in FAST-106. Hopefully that calculation will result in zero, right? No, it won't, but that's what I need to explain. Because the way you calculate this, and you can see this, it's in FAST-106, it's at page FAST-106.27 in the appendix of the government's brief if you want to look at it, paragraph 110. The way you do it is you start by calculating the accumulated post-retirement benefit obligation. So as of 2006, how much will Northrop owe in the future to pay the benefits that it's already committed to provide? Which is $253 million. No, it's well more than that. It was well, well more than that, and I'll explain why. That was the amount attributable to the increase in health costs, but they had other obligations as well. So if I may, Your Honor, it's more complicated than that. All right. What you do, it's not a bottom-up calculation. It's called the APBO, the accumulated post-benefit obligation. You do an actuarial projection. How much is this going to cost for us to pay out? Then you look at how much you have in the way of plan assets, and that's the amount that you've put in so far. And the difference is the transition obligation. And what happened here was Northrop, through the negative plan amendment, eliminated $307 million of future costs from the previously provided benefits, which it had the authority to do under the plan and under the Cast Board's interpretation, which we've talked about. And what that does, just as a matter of logic, is it reduces the amount of the accumulated post-benefit obligation, the amount you've got to pay in the future, by that amount. So, of course, it goes right into the transition obligation. The expert testimony and the lay testimony was that the $253 was encompassed in that $307. Now, what's the rest? Your Honor's asked that question. Here's the rest. There's still a transition obligation remaining, and the government doesn't contest that there's still going to be some because they're paying out part of it. They're just contesting this $253. The rest is this. For one thing, we were allowed to use DEFRA for contracts entered into before 1995. You apply the FAR from before 1995. We're allowed to use DEFRA there, so there's going to be a gap from that. That's part of what's remaining. The other part of what's remaining is this, that if you had been using FAST-106 instead of DEFRA, you would have been projecting future increases in health care costs all along, so you would have been funding at a higher level. But health care costs actually accelerated at a pace far, far faster than even the FAST-106 predictions had it accelerating. So by the time you got to 2006, when you actually did your top-down, not your bottom-up, actuarial projection of how much these benefits were going to cost, it was a huge number. It was, before the negative plan amendment backed up the 307, it was, I think, over a billion dollars. If you think about that, that makes sense. There were 33,000 employees in this plan as of 1995, and certainly more after. And the caps of 7,000 pre-Medicare, 4,000 post-Medicare were annual caps, not lifetime caps. So if you just do the math, you can see you can get to a billion dollars pretty quickly in terms of what the projection would be. So the projection as of 1996 was woefully low. Correct. And that was only 200. That's where the 253 million came, the difference between the DEFRA and the 106 line, as I gather, that would have been what? If the projection had turned out to be correct, that would have been the amount that would have been collected under DEFRA if the DEFRA line had continued, except that you're not allowed to charge at that level. Right. But then to get back, Your Honor was having a colloquy with my friend on the other side about how does this work out for the government here. I do think it would be worth kind of going through that because I would make one amendment to the discussion. I think the way to think about it is this. If we had paid in, if we had been using FAS 106, we would have been charging the government that 253 million, they would have paid it. And so they would have been out 253 million, they would have paid it, it would be funded, it would be in the plan. And then if we execute the negative plan amendment and we reduce the amount going forward by however many million we reduce it, they wouldn't have to pay that either. That's the 307. Yes, that's the 307, which incorporates the 253. But I think that the government, on the government's theory, they're not 500 and some million better off, they're 253 million better off. Because if that 253 million is already in there because they paid it under FAS 106, then there'll be less of a charge in the future because the transition obligation will go up. They still come out $253 million ahead, and that's why they're wrong about this. If you adopt our approach to it and the board's approach to it and why the board, I think, found what it did in quantum was that they didn't pay the 253 in, and now they want a deduction of 253 million as though they paid the 253 million in. So they end up 253 million better off than if we had done what they said we should have done all along. And that just can't be right. Let me preface this by acknowledging that I may not understand this, but just on simple logic, the reason you have to pay, I think the government would say, when you messed up was because of the regulations. You get sort of a penalty because you're flipping, and you could have, under the old regulation, you could have claimed that on an annual basis or whatever it is, and you didn't. So, yes, it's a penalty. Maybe it looks like or you can make it sound like unjust enrichment for the government, but you're going to be penalized for that $253 million. And wasn't that the determination? You're liable for that 253 million, right? No, Your Honor. I disagree at a few places there, if I could. First, the government is running as fast as they can from the argument that this is a penalty. And the reason for that, I think, is because there isn't any lawful authority to impose anything approximating a penalty. Well, an amount you're obligated to cover. Right, but I guess here's the problem with this. There is no legal basis. Whether you call it a penalty or call it something else, there's no legal basis for sticking it to us. The only thing that the government has the authority to do, and this you would look at FAR 31-201-2C, and what that provision says, we cited it on page 6 of our brief, what that provision says is when contractor accounting practices are inconsistent with the cost allowability rules here, costs resulting from such inconsistent practices in excess of the amount that would have resulted from using practices inconsistent with it are unallowable. Unallowable. That means we can't ask for it. That's what it means. We can't ask for it. Then the next provision, subsection 2D, says contractors responsible for accounting costs appropriately, et cetera, et cetera, adequate to demonstrate that costs claimed, in other words the costs that we ask the government for, have been incurred, are allocable to the contract, and comply with the applicable cost principles, i.e. FAS 106. The contracting officer may disallow all or part of a claimed cost, i.e. a cost we ask the government for. So the fight in this case with respect to the quantum hearing is not about whether this is an allowable cost or an unallowable cost, whether we should have incurred it and charged it in the years 95 to 206 or not. The question is whether the government has the authority to disallow it. And the only thing the government has the authority to disallow is a cost we actually claim, that we actually put in our incurred cost statements and say to the government, pay this cost. And the point is we never did that. That's exactly what the quantum board adjudicated. And you promised not to do it in the future, as far as I understand, right? Correct. We didn't do it before 2006. The negative plan amendment extinguished what the quantum board found was, in its words, the same costs that constituted that delta. And that's why I think it's critical, if you don't mind me just repeating what I do think is the key sentence. Just hypothetically, if you were to claim those costs in the future, the $253 million, then wouldn't it seem like that would unravel the entire accounting procedures adopted by Northrop, and you would be on the hook for not only that, but for the additional $253 million? So I think if we did, the government would argue that we couldn't do that because we were trying to allocate to subsequent years something that we should have allocated to earlier years, and it would throw the whole thing in disarray. Your Honor is right about that. But we haven't done it. We've been very clear that, as I said, this is what the quantum hearing was about. This was the issue we litigated. The government had a full and fair opportunity to prove that that $253 million was in the transition obligation, and the specific thing that the quantum board held was that the government failed to sustain its burden of proving that any of the disallowed amount was or will be amortized as part of the transition obligation. The board held it isn't in there. And the board also noted, of course, that the government didn't put on any expert actuarial testimony or any factual actuarial testimony. This is, again, the paragraph on page 35 of the appendix, to rebut our position on this. And so that's why, getting back to Judge Bryson's colloquy, that's why the government will end up getting a windfall here. It's because we never charged them this. It's one thing to say you can disallow a cost that wasn't calculated in conformity with the accounting rules that apply if you go to the government and say pay this cost. And this was all made possible because Northrop lowered the benefits provided to the workers, right, at the start of the transition plan? It did, it did. So the government's not bearing the brunt of this. Northrop's not bearing the brunt, but the workers are. You know, I understand that. They're the ones being stuck to, as you say. I understand the point there, Your Honor, but if I could, a few responses. Sure. First, if the government had allowed us to stay with DEFRA, then the problem wouldn't have arisen. And that's not a crazy suggestion. You know, in 2009, a few years after this all transpired, the government changed the FAR again to make DEFRA a lawful way to do this because they realized what they did earlier was a mistake. Well, it wouldn't have arisen unless you had decided in 2006 that things were skyrocketing and therefore you had to let them down. Right. In which case, once again, the employees would be the ones that would... Well, that's right. But I do think that's where the second of the three points I wanted to make was that, you know, this was an era in which I think in 2006 the medical and drug costs went up 36% in one year. I mean, this was a time when costs were going crazy. And what the CAS Board had decided in 2003 was that unless contractors are given the flexibility to make retroactive, admittedly retroactive adjustments here, they're just not going to provide these post-retirement benefits at all because they won't be able to control the costs. And this is not something that we only did. Virtually every contractor did this. We cited a study at page 17 of our brief that when contractors made the transition from DEFRA to FAS 106, they all did this because of the massive cost problem that arose. And then the third point I'd like to make, and, of course, the government's position doesn't solve that problem either. This money doesn't go to the workers. If the government prevails here, it goes to the government. So I'm not sure it's an argument that the government can really make with any force. And then, again, I will say this was a situation in which, year over year, it's not like it was a surprise to the government that we were using DEFRA during this time period. And we get audited every year. We submit our papers to the government, they look at it, and every year they told us, no problem. Several years they said, we approve, this is compliant. So the idea that there's something less than above board here, which the government insinuates from time to time, it's just not right. And I see I'm over my time, but I'd like to make one point responding to the point my friend on the other side made about the financial reporting versus government contract reporting and the screenshot of our papers. They make a big deal of, well, there's a service cost line and there's this other line that shows $407 million, and they're separate, and this shows it's all separate. Well, in our brief, which preceded the reply brief which has this in it, we explain the situation. We cited to the expert testimony in the record from Mr. McQuaid, and this is at page 1419 of the appendix, that actually that 407, whatever that number is on the sheet, includes the 307, which includes the 253, and that all of that is spelled out in detail in Northrop's work papers accompanying the financial statements. And so they come back in their reply brief and they go through all this stuff about the service cost line, but they didn't address the evidence in the record that refutes it. So it's just it has no merit whatsoever. Thank you. Thank you. Suppose, Your Honor, that tomorrow, more than five years, Northrop makes another plan amendment and they put all the costs right back in. Do you think that somehow this would be unwound in any way? No. Each change has its own effect. These are separate events, and you have to ask, why is the outcome different to the 253 million if you combine them together? What is the real legitimate connection between changing the benefits of your plan and changing the scorebook, changing which set of accounting books you use? What's the connection there that enables you to combine these events and have a $253 million difference? And there is none. It's not correct to look at this differently. The reason we're here is because the Board did not interpret and apply the regulation and the accounting rule correctly. That's it. If this case turns into what's most fair, are we out so much, are they getting something they're not supposed to get, that's not what the case is about. The rules have to be followed by everybody because they're the rules. in the contract. And the Board completely lost sight of the fundamental cornerstone of this accounting rule, FAST-106, that says those costs were incurred, they did accrue, regardless of whether you wrote them down in your government contracts cost ledger. There's no getting rid of them later. The accounting is complicated, but the principle is not. Nothing changed in the FAST-106 books. Why didn't the government tell Northrop that over the 11 years from 1995 to 2006, when Northrop was informing you, here's a situation that's developing down the future and this is what we're proposing to do, let's get together, let's have an agreement, and yet the government never answered to that. Your Honor, we don't see it that way at all. Northrop's made clear they did look at this back then. The government had no reason to look at it because nothing in excess was claimed at that time. It's all about what happened in those post-transitions. But you were aware of the type of accounting procedures that they were using, that you were aware of. We absolutely knew they were. At the end of the day, and correct me if I'm wrong, everything that Northrop did, they're entitled to change and cap or even eliminate altogether all benefits to the workers if that's what they chose to do. So they haven't done anything improper or illegal here. We're not saying anything like that. The only question, Your Honor, is what is the effect on which costs they can recover from the government under the rule? Thank you. We thank both sides of the cases submitted. That finally concludes our proceedings.